UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

BENJAMIN DEDJOE,

                    Plaintiff,

         -against-                                    1:15-CV-1170 (LEK/CFH)

RYAN D. MCCARTHY, in his capacity
as Acting United States Secretary of the Army,

                    Defendant.
_____

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

Plaintiff Benjamin Dedjoe, a former employee of the Watervliet Arsenal in Watervliet,

New York, brings discrimination, hostile work environment, and retaliation claims under Title

VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq*. Dkt. No. 1 ("Complaint")

¶¶ 35–42.  Defendant Ryan D. McCarthy, in his official capacity as Acting Secretary of the

Army,[1] moves for summary judgment on each claim. Dkt. Nos. 43 ("Motion"), 43-1

("Memorandum"). Plaintiff opposed the motion, Dkt. No. 48-41 ("Response"), and Defendant

submitted a reply, Dkt. No. 54 ("Reply"). Plaintiff also moved for sanctions against Defendant

and defense counsel, Dkt. No. 34-1 ("Motion for Sanctions"), under Federal Rules of Civil

Procedure 26(g) and 37(c), citing Defendant's allegedly unreasonable delays and incomplete

interrogatory responses during discovery. Dkt. Nos. 34-1 ("Sanctions Statement of Material

_____

[1]  Ryan D. McCarthy was designated as Acting Secretary of the United States Army on
August 2, 2017. The Court instructs the Clerk of the Court to amend the caption of this case to
reflect the substitution of Acting Secretary McCarthy as the defendant in this matter in
accordance with Federal Rule of Civil Procedure 25(d).

Facts"), 34-2 ("Sanctions Memorandum"). For the reasons that follow, the motion for summary judgment is granted in part and denied in part, and the motion for sanctions is denied.

## II.    BACKGROUND

### A. Factual History

The facts that follow are undisputed unless stated otherwise. Plaintiff was employed as an electrical engineer with the Department of Public Works at the Arsenal from 2010 through October 2014. Compl. ¶ 7; Dkt. Nos. 43-2 ("Statement of Material Facts") ¶ 1, 43-52 ("Dedjoe Deposition") at 258. He is a Black man who is originally from Ghana and speaks English with an accent. Compl. ¶ 7. This section outlines the factual history of each of the incidents comprising Plaintiff's Title VII causes of action.

#### 1.  *The August 2010 E-mail*

On August 24, 2010, Plaintiff, along with five co-workers, received an e-mail from Brett Herrey, an Arsenal maintenance worker. Dkt. No. 48-42 ("Response Statement of Material Facts") ¶¶ 100–01. The e-mail's subject line stated, "WHY STEALING COPPER IS A BAD IDEA," and contained an attached slide presentation. Id. The presentation conveyed information regarding "high voltage shock" and the appropriate tools for dealing with high voltage, and contained photos depicting the body of an electrocuted Black man. Id.; Dedjoe Dep. at 117; Dkt  No. 48-20 ("Herrey E-mail"). Herrey is Caucasian and Plaintiff was the only African-American who received the e-mail. RSMF ¶¶ 103, 107.

#### 2.  *Complaint to Brad Frasco*

Around August or September of 2012, Plaintiff worked on a project with an electrical contractor called Pichardo Electric, Inc. RSMF ¶ 110. Pichardo Electric's team consisted of

Carlos Pichardo, Jr., and six workers, all of whom were Hispanic men. Id. ¶ 111. During

Plaintiff's employment with the Arsenal, Law Enforcement and Security Division ("LES")

personnel were responsible for controlling access to the Arsenal, including the access of

contractors. Dkt. No. 43-7 ("Sibiga Exhibit D") § 2.8. Pichardo complained to Plaintiff that LES

employees regularly delayed him and his crew at the Arsenal's Visitor Center while permitting

White contractors to enter the Arsenal "in minutes." Compl. ¶ 21. Plaintiff asked LES employee

Bradley Frasco "why his colleague was being delayed, and why there was no equal treatment"

with White contractors. Dkt. No. 48-43 ("Dedjoe Affidavit") ¶ 27. Frasco "raised his voice" and

asked Plaintiff if he was accusing LES of racism. Id. ¶ 28. Frasco continued to loudly object to

Plaintiff's concerns, and Plaintiff eventually ended the conversation. Id.; RSMF ¶¶ 114–15.

### 3. Vandalism Complaint

Plaintiff parked his car in the Arsenal parking lot when he went to work. Dedjoe

Aff. ¶ 29. On September 5, 2012, Plaintiff reported alleged vandalism to Lieutenant Roy

Barringer and Patrolman Stephen Huneau of LES, citing several scratches and dents on his car.

Compl. ¶¶ 16–17; RSMF ¶ 116. The officers thought the damage to the car was consistent with

ordinary wear. Dkt. Nos. 43-9 ("Sibiga Exhibit F"), 43-10 ("Sibiga Exhibit G"). Plaintiff accused

them of dismissing his concerns because of his race. Dedjoe Aff. ¶¶ 32–34. While Barringer and

Huneau did not file a police report at the time, LES filed a police report regarding the incident

when Plaintiff brought a request for one from his insurance company the next day. Sibiga Ex. G;

Compl. ¶ 16. Plaintiff alleges that, although they did not file his report until he brought a request

from his insurance company, LES officers "routinely prepare reports to document vandalism."

Compl. ¶ 17.

*4. Plaintiff's encounters with LES personnel at the South Gate*

<u>a.</u> <u>Arsenal Security Procedures at the South Gate</u>

During the period of Plaintiff's employment at the Arsenal, LES personnel stationed at the South Gate (the facility's only civilian entry point, Dkt. No. 43-60 ("Valle Deposition") at 69–70) were required to verify the identity of entrants into the Arsenal and ensure that entering vehicles had proper documentation. Sibiga Ex. D. § 5.4; Dkt. No. 43-3 ¶¶ 10–14. LES personnel were required to physically examine the front and back of identification cards of every person entering the Arsenal. SMF ¶ 73.

Furthermore, during the relevant time period, every privately owned vehicle entering the Arsenal was required to display a "DD Form 2220, Department of Defense Vehicle Decal," or DOD decal, on its windshield. Dkt. No. 43-6 § 7(c). The windshield also had to display a current "date tab" sticker that was to match the year that the vehicle's state registration would expire. Sibiga Ex. D § 5.4.3. LES personnel were permitted to deny vehicles with mismatched date tab stickers access to the Arsenal. <u>Id.</u>; SMF ¶ 76.

DOD decals only became invalid when an individual terminated their employment with the military, or when the decal was damaged in a manner that rendered it no longer "visible and serviceable." Valle Dep. at 94–95. To obtain a new DOD decal, the employee had to fill out a form with LES that contained fields pertaining to the employee's identity, status at the Arsenal, and their vehicle information. Dkt. No. 43-56 ("Osgood Deposition") at 46. The Arsenal's vehicle registration policies were summarized in a January 2012 document ("Command Information Bulletin") that was circulated to every Arsenal employee. Osgood Dep. at 71–72.

### b. Plaintiff's General Complaints against Michael Valle

Plaintiff complains that, throughout his employment, he was regularly mistreated by LES employee Michael Valle. Valle "would treat [him] like a stranger," and "hyper-scrutinize" his identification card "in an obnoxious display." Dedjoe Aff. ¶ 37. Further, "Valle generally displayed contempt for [Plaintiff] in the manner that he spoke to [him]." Id. ¶¶ 39–40.

### c. The September 20, 2012 Incident

On September 20, 2012, Plaintiff entered the Arsenal after lunch. RSMF ¶ 141. His date tab sticker read "12" and his state registration was set to expire in 2014. Id. Defendant states that Valle allowed Plaintiff into the Arsenal to go to the Security Office and get a date tab sticker that matched his registration. SMF ¶ 8. Plaintiff states that Valle radioed to the guard at the main gate, Paul Edwards, to complain about Plaintiff's date tab sticker and attempt to prevent his entry into the Arsenal. Dedjoe Aff. ¶ 45. In any event, Edwards permitted Plaintiff to enter the Arsenal. Id. Shortly thereafter, Plaintiff complained to LES employee Captain James Osgood about Valle. Compl. ¶ 18. Defendant asserts that Plaintiff solely complained that Valle was harassing him regarding his car's stickers, SMF ¶ 9. Plaintiff adds that he told Osgood that Valle was subjecting him to racial harassment, Dedjoe Aff. ¶ 49. After examining Plaintiff's date tab sticker and vehicle registration sticker, Osgood determined that Valle was correct and that no harassment had occurred. SMF ¶ 10; Osgood Dep. at 59–60. Osgood did not file a complaint against Valle on Plaintiff's behalf. Dedjoe Aff. ¶ 50.

Lauren Smith, the Arsenal's Chief of Staff during the relevant period, asked Plaintiff to put his complaint against Valle in writing after Plaintiff brought his dispute to her attention on September 21, 2012. Dedjoe Dep. at 211–12; Compl. ¶ 20. The parties dispute whether Plaintiff

alleged that Valle subjected him to racial harassment in his face-to-face conversation with Smith. Dedjoe Aff. ¶ 51. Plaintiff sent Smith an e-mail summarizing his complaint, where he stated that he would "file discrimination/harassment charges against" Valle if hedid not stop harassing him. Id. ¶ 52; Dedjoe Dep. at 213.

Plaintiff asserts that LES stopped no other vehicles for displaying an expired date tab sticker on September 20th. Compl. ¶ 19. Plaintiff observed twenty other vehicles in the Arsenal parking lot on that day displaying mismatched date tab and state registration stickers. Id. Moreover, a White employee, Robert Shadlock, told Plaintiff that he had "driven into this post with expired tags all the time." Dedjoe Dep. at 84. Defendant, however, asserts that LES personnel began enforcing car registration policies more strictly during the period of Plaintiff's employment, Dkt. Nos. 43-59 ("Migaleddi Deposition") at 115–16, 43-57 ("Uram Deposition") at 23–24, and that Valle strictly enforced Arsenal security policies, Uram Dep. at 30, 35–37. Also, then-Arsenal Commander Mark Migaleddi stated that LES personnel "had denied access to several employees" whose vehicles had expired date tab stickers. Migaleddi Dep. at 75.

### d. The November 7, 2012 Complaint

On November 7, 2012, the DOD decal on Plaintiff's car was torn, although the decal's serial number was still visible. Compl. ¶ 22; SMF ¶ 31. Valle noticed the tear, and told Plaintiff to get a replacement decal. Dedjoe Aff. ¶ 55. Plaintiff immediately headed to the Visitor Center where the LES employee at the desk gave him a replacement decal application and told him that the form only required the last four digits of Plaintiff's Social Security Number. Id. ¶ 56. In the afternoon, when Plaintiff returned with the completed form, Valle was working at the Visitor Center desk. Compl. ¶ 22. Valle conducted a "long, exaggerated review of Plaintiff's

application" and informed him that the application for a DOD decal required Plaintiff's entire Social Security Number. Id. ¶ 23. Valle and Plaintiff argued over the application's requirements. Id. During the argument, Valle radioed Osgood for assistance and Osgood dispatched Frasco. Osgood Dep. at 88–89.

The facts that follow are disputed. Plaintiff. According to Plaintiff, before Frasco intervened, Plaintiff had already complied with Valle and completed the application. Compl. ¶ 23. Once Frasco arrived, he "walked toward [Plaintiff], questioning [him], causing [him] to back toward the wall." Dedjoe Aff. ¶ 63. While arguing with the officers in the Visitor Center, Plaintiff stated that several of the guards were racist. Dedjoe Dep. 229–30. Frasco yelled, "[A]re you calling us racist again?" Dedjoe Aff. ¶ 63. He pushed Plaintiff, shouting, "[G]et the fuck out of here," "[F]uck you," and "I don't care who you are." Id. ¶ 64. Plaintiff stepped outside the Visitor center. Id. ¶ 65. Frasco followed him and said that Osgood was coming and would "fuck [Plaintiff] up." Id. Once Captain Osgood arrived at the Arsenal parking lot, he said to Plaintiff, "[G]et in your car and get the fuck out of here or I am going to put you under arrest, tow your BMW and if you resist I will use deadly force if necessary." Id. ¶ 68. Plaintiff drove his car to a nearby parking lot and returned to the South Gate on foot, but Frasco walked toward him and repeated, "Get the fuck out of here." Id. ¶ 76. Plaintiff then left for the day. Id. ¶ 77. Plaintiff alleges that he did not behave "in a physically threatening manner," did not use profanity, and never referred to LES employees as "gangsters." Dedjoe Dep. 222–25.

According to Defendant, Plaintiff did not complete his decal application by the time Frasco arrived, and became "completely irate and non compliant" when Frasco urged him to complete the application. Dkt. No. 43-17 ("Sibiga Exhibit N"). Plaintiff called the LES

employees in the Visitor Center "gangsters" and shouted, "[d]on't you try and fucking touch me." Id. According to a November 7 statement prepared by Valle, "At no time during the interaction did the officers raise their voices, use harsh language, use or threaten the use of any force." Dkt. No. 43-16.

The parties agree that Plaintiff was able to return to the Arsenal on November 8th without trouble, Dedjoe Dep. at 226, and that he reported the Visitor Center incident to the Arsenal's Equal Employment Opportunity ("EEO") Office later that day, RSMF ¶ 44. Finally, no deposed former or present Arsenal employee knew of anyone who had ever been ejected from the Arsenal for any reason other than alcohol or drug use. Id. ¶ 225; Dkt Nos. 48-3 ("Edwards Deposition") at 97–98; 48-6 ("Roe Deposition") at 70, 83–84; 48-9 ("Smith Deposition") at 144–45; Migaleddi Dep. at 148–50; Uram Dep. at 22, 24.

### e. Incidents after November 7, 2012

On May 2, 2013, LES personnel stopped and searched Plaintiff's car pursuant to a "Random Antiterrorism Measure." Compl. ¶ 32; SMF ¶ 57. Barringer stated that, pursuant to the Random Antiterrorism Measure, LES personnel attempted to search every car entering the South Gate between 10:00 AM and 12:00 PM, but sent some cars through without subjecting them to the search whenever a line of cars formed at the Gate. Dkt. No. 43-26 ("Sibiga Exhibit W"). Plaintiff's car was searched when he arrived because "there was a spot open" at the Gate. Id. While Plaintiff's car was searched, he received a verbal and written warning informing him that the state inspection sticker on his car was expired and that he would receive a ticket if he did not promptly get his vehicle inspected. Id. By 12:00 PM, the officers had searched twenty-five cars. Id. Three days later, Valle issued Plaintiff a ticket for having an expired inspection sticker after

Plaintiff drove onto the Arsenal lot without getting a new inspection. Dkt. No. 43-28. Plaintiff quit his job at the Arsenal in October of 2014 and accepted a job with the Social Security Administration. Dedjoe Dep. at 258–60.

### 5. *Discrimination Complaints from Other Arsenal Employees*

Plaintiff references harassment complaints made by other Arsenal employees against LES personnel and Michael Valle in particular.[2] First, Jesus Guerra, a Hispanic man, was a crane operator for the Arsenal. Dkt. No. 48-44 ("Guerra Affidavit") ¶ 2. Guerra states that Michael Valle radioed for Jesus (pronounced "Hey-Zeus") and called him "Jesus" (pronounced "Gee-zus") on three occasions. Id. ¶ 6. In October of 2013, an unknown person painted the word "spic" on Guerra's office door. Id. ¶ 8. Second, Samuel Hinton, an African-American Arsenal employee, complained that, twice over the span of several days in July of 2013, his vehicle was stopped and searched at the South Gate because LES employees incorrectly claimed that his vehicle smelled of marijuana. Dkt. No. 55-1 ("Hinton Affidavit") ¶¶ 11–18. His affidavit alleges that he described the incidents as racial profiling to Paul Edwards after he was stopped the second time. Id. ¶ 19. Third, Paul Edwards, the only African-American security guard assigned to a shift with Valle, filed a complaint accusing Valle of harassment in June 2011. Edwards Dep. at 52. Valle regularly criticized and insulted Edwards, while not criticizing other guards. Id. at 48.

---

[2] Plaintiff also cites a sexual harassment complaint by Arsenal employee Danielle Attanasio to support his hostile work environment claim. However, Plaintiff's evidence regarding Attanasio's complaint is limited to a conversation about her complaint between two other Arsenal employees. Defendant correctly observes, Reply at 6, that this document is inadmissible hearsay. See, e.g., Capobianco v. City of New York, 422 F.3d 47, 55 (2d Cir. 2005) (observing that hearsay statements "are an insufficient basis for opposing a motion for summary judgment").

Among many other incidents in Edwards' complaint, Valle allegedly told Edwards that he needed to "learn to speak English." Id. at 50–51.

## B. Procedural History

Plaintiff submitted a discrimination complaint with the Arsenal's EEO Office on January 10, 2013. Compl. ¶ 4. Plaintiff filed his Complaint in this Court on September 30, 2015. Id. ¶ 5. The Complaint alleges three causes of action under Title VII. Id. ¶ 35–42. First, Plaintiff claims that Defendant subjected him to discrimination based on his race, skin color, and national origin. Id. ¶ 38. Second, Plaintiff claims that Defendant subjected Plaintiff to a hostile work environment based on the same traits. Id. ¶ 40. Third, Plaintiff claims that Defendant retaliated against Plaintiff for complaining about racial discrimination. Id. ¶ 42. On March 27, 2017, Defendant moved for summary judgment on each of Plaintiff's causes of action. Mot. Plaintiff opposed the Motion, Resp., and Defendant filed a reply, Reply.

## C. Discovery History

Plaintiff served Defendant with his first set of discovery demands on March 2, 2016, and the parties agreed to give Defendant until May 27, 2016 to provide responses. Sanctions SMF ¶ 5. Plaintiff provided discovery responses on June 2. Id. ¶ 6. Plaintiff inquired with Defendant regarding the responses several times over the next two months. Id. ¶¶ 7–11. Defendant did not provide his responses until August 4, 2016. Id. ¶ 14. Interrogatory Number 10 in Plaintiff's first set of discovery demands asked Defendant to "[i]dentify each and every document in defendant's possession, custody and/or control relating to any and all complaints of racial harassment against the Watervliet Arsenal Security Police, and specifically but not limited to complaints of harassment against security officer Michael Valle." Id. ¶ 15. A corresponding request for

production asked Defendant to produce any documents identified in response to the interrogatory. Id.

Defendant objected to the interrogatory as overly broad and as seeking disclosure that is prohibited by the federal Privacy Act, 5 U.S.C. § 522a, in the absence of a court order. Dkt. No. 36-11 ("Interrogatory Response") at 10–11. Defendant also stated that "it is not aware of any other complaints of racial harassment made against Michael Valle or other police at [the Arsenal], but is continuing to inquire and will supplement this response if necessary." Interrog. Resp. at 11. On November 14, 2016, Magistrate Judge Christian Hummel issued a protective order limiting the use of the Valle documents and an order permitting the disclosure of these documents as required by the Privacy Act. Sanctions SMF ¶¶ 27–28.

On November 15, 2016, Defendant's counsel produced, in addition to the documents Plaintiff requested, all documents relating to (1) each of Valle's proposed suspensions, including 2011 and 2012 suspension proposals; (2) his 2016 removal proposal; (3) his EEO complaint, and; (4) numerous documents relating to complaints against Valle held by John Sibiga, his former supervisor (together, the "Valle Documents"). Sanctions Opp'n Mem. at 6–7. Assistant United States Attorney Karen Lesperance learned of the documents held by Sibiga when, during Osgood's deposition preparation, Osgood told her that Sibiga "'had a box' relating to problems with Valle." Dkt. No. 36-1 ("Lesperance Declaration") ¶ 9. Lesperance determined that Sibiga's documents revealed that many employees of various races complained against Valle, and she produced these documents as a "supplemental Rule 26 disclosure." Id. ¶ 12.

Plaintiff maintains that many of the documents that Defendant produced on November 15th should have been produced in response to Interrogatory Number 10 because they constituted

documents relating to racial harassment. Sanctions SMF ¶¶ 34–36, 39, 41, 43, 47. The relevant

documents include those discussing Edwards' complaint (described above) and the portion of

Guerra's complaint alleging that Valle mispronounced his name over the radio. Id. ¶¶ 37, 42. The

Valle Documents include Hinton's complaint. Dkt Nos. 48-50, 48-51 ("Hinton Exhibits"). The

Valle Documents also reference an informal complaint by Danielle Attanasio accusing Valle of

sexual harassment. Sanctions SMF ¶ 40. Plaintiff's counsel deposed several witnesses "without

benefit of the Valle documents." Id. ¶ 30. After receiving the Valle Documents, Plaintiff re-

deposed Lauren Smith for over an hour on December 21, 2016. Dkt. No. 36 ("Sanctions

Opposition Memorandum") at 9.

Plaintiff moved for sanctions against Defendant on January 9, 2017, seeking payment for

"reasonable expenses incurred by plaintiff as a result of [Defendant's] failure to produce."

Dkt. No. 34-2 ("Sanctions Memorandum") at 6. Defendant filed its response to the motion on

January 25, 2017, Sanctions Opp'n Mem., and Plaintiff subsequently filed a Reply, Dkt. No. 37

("Sanctions Reply").

## III.    MOTION FOR SUMMARY JUDGMENT

### A.  Legal Standard

A court must grant summary judgment if "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "[A] party

seeking summary judgment always bears the initial responsibility of informing the district court

of the basis for its motion, and identifying those portions of [the record] which it believes

demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S.

317, 323 (1986). The nonmoving party must then "make a showing sufficient to establish the

existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id.

While the nonmoving party must do "more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), a court at the summary judgment stage must "review all of the evidence in the record. In doing so, however, the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 150 (2000); see United States ex rel. O'Donnell v. Countrywide Home Loans, Inc., 822 F.3d 650, 653 n.3 (2d Cir. 2016).

Finally, a "court must be cautious about granting summary judgment to an employer" in discrimination cases because it is often the case that the employer's "intent is at issue." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994); accord Bader v. Special Metals Corp., 985 F. Supp. 2d 291, 305 (N.D.N.Y. 2013) (Kahn, J.). Nevertheless, "summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact." Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 608 (2d Cir. 2006) (quoting McLee v. Chrysler Corp., 109 F.3d 130, 135 (2d Cir. 1997). See also Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.").

**B. Discussion**

*1. Discrimination*

As noted above, Plaintiff's Complaint states a discrimination cause of action under Title

VII. Compl. ¶¶ 36–38. However**,** Plaintiff's Response against the hostile work environment and retaliation claims and fails to even mention the discrimination claim. Resp. The Court treats the claim as abandoned and grants Defendant's Motion with respect to the discrimination claim. See Jackson v. Fed. Express, 766 F.3d 189, 197–98 (2d Cir. 2014) ("[I]n the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned."); Kovaco v. Rockbestos-Surprenant Cable Corp., 834 F.3d 128, 143–44 (2d Cir. 2016) (affirming district court's grant of summary judgment on abandonment grounds because plaintiff's opposition to summary judgment motion "failed to support or even address the purported hostile-work-environment claims"); Hall v. Verizon New York, Inc., No. 13-CV-5518, 2017 WL 3605503, at *7 (S.D.N.Y. July 26, 2017) (dismissing discrimination claims "as abandoned" because plaintiff "made no effort whatsoever to address these claims in her opposition brief on [defendant's] motion for summary judgment").

### 2. Hostile Work Environment

Plaintiff claims that he was subjected to a hostile work environment on account of his race, skin color, and national origin. Compl. ¶ 40. To establish a hostile work environment claim, a plaintiff must demonstrate that he was subjected to harassment that was "sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)); accord Kaytor v. Elec. Boat Corp., 609 F.3d 537, 546 (2d Cir. 2010).

There must also exist "a specific basis . . . for imputing the conduct that created the hostile environment to the employer." Perry, 115 F.3d at 149. Finally, "it is axiomatic" that the incidents

giving rise to a hostile work environment "occur[] because of an employee's . . . protected characteristic, such as race or national origin." Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 20 (2d Cir. 2014) (quoting Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001)). A plaintiff can raise an inference of discrimination by producing evidence of explicit racial bias—for instance, evidence of racial slurs used by other employees. See Feingold v. New York, 366 F.3d 138, 150–51 (2d Cir. 2004) (holding that anti-Semitic remarks raise inference of racial animus); Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997) (holding that "a steady barrage of opprobrious racial comments" creates a hostile work environment). A plaintiff can also raise this inference by showing that the "employer treated him . . . 'less favorably than a similarly situated employee' outside of the protected group." Raspardo v. Carlone, 770 F.3d 97, 126 (2d Cir. 2014) (quoting Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000)).

### a.  Other Arsenal Employees' Allegations of Racial Harassment

Plaintiff cites instances of alleged racial harassment by LES personnel against other non-White Arsenal employees to raise an inference that otherwise race-neutral confrontations between Plaintiff and LES personnel were tainted with racial animus. Resp. at 5–6. Plaintiff's evidence, however, is insufficient to generate an inference of racial animus toward the affected employees, let alone toward Plaintiff. First, Paul Edwards was the only African-American guard who shared a shift with Michael Valle, and Valle regularly criticized Edwards while not criticizing other White guards. Edwards Dep. at 48. However, even if Valle treated Edwards worse than White guards on the same shift, this does not contradict Defendant's evidence that Valle criticized and belittled White employees throughout the Arsenal. See Fenner v. News Corp., No. 09-CV-9832, 2013 WL 6244156, at *18–19 (S.D.N.Y. Dec. 2, 2013) (no inference of racial animus where defendants

"dispensed [verbal abuse] rather freely in the newsroom to employees of different races"). For instance, Osgood stated that he received complaints against Valle "from all sorts" of people, regardless of race, and that they complained about Valle's "professionalism" and his "tone of voice" and that "they felt that [Valle] was talking down to them." Osgood Dep. at 125.

Alongside numerous incidents of which Edwards complains, the only incident arguably involving racial animus is Valle's statement that Edwards "should . . . learn to speak English." Edwards Dep. at 50–51. However, "stray remarks . . . do not constitute sufficient evidence to make out a case of employment discrimination." Danzer v. Norden Sys., Inc., 151 F.3d 50, 56 (2d Cir. 1998); see also Pacheco v. Comprehensive Pharmacy Servs., No. 12-CV-1606, 2013 WL 6087382, at *10–11 (S.D.N.Y. Nov. 19, 2013) (finding defendant's statement implying that "Dominican[s] were not 'very nice'" was "too isolated, remote, and benign to give rise to an inference of discrimination"); Campbell v. All. Nat. Inc., 107 F. Supp. 2d 234, 247 (S.D.N.Y. 2000) (supervisor's instruction to employee "not to hire anyone for the receptionist position who was not light-skinned or who had an accent" held as "the kind of isolated and stray remark that is insufficient to establish racial animus and defeat a motion for summary judgment").

Second, for the same reason, even if Valle's mispronunciation of Hispanic employee Jesus Guerra's name, see Guerra Aff. ¶ 6, was motivated by racial animus, and the Court is not persuaded that it was, this remark combined with Valle's comment to Edwards is insufficient to permit the inference that Valle's racism was so pervasive that his race-neutral confrontations with Plaintiff were also motivated by racial animus. Moreover, as Defendant explains, while the incident where someone drew the word "spic" on Guerra's office door is upsetting, the perpetrator was unknown and Plaintiff does not allege that anyone who allegedly subjected him to harassment

was involved in that incident. Reply at 8 n.6; RSMF ¶¶ 189–92. Therefore, Guerra's complaint does not create an inference of racial animus on the part of Valle or anyone else who allegedly subjected Plaintiff to racial harassment.

Third, the alleged harassment experienced by African-American employee Samuel Hinton—whose vehicle was stopped and searched twice by LES personnel because of the erroneous detection of an odor of marijuana—is even less probative of racial animus directed against Plaintiff. Hinton Aff. ¶¶ 11–19. Hinton's affidavit provides nothing more than Hinton's belief that he was racially profiled, and Plaintiff provides no evidence indicating that LES personnel would not have stopped White employees for suspected drug use. Therefore, this incident does not permit an inference of discrimination based on less favorable treatment compared to similarly situated White employees.

Fourth, Plaintiff argues that "a fact finder could reasonably infer racial animus in the Security division's disparate treatment of Hispanic contractors passing through the visitor's center to work at the Arsenal." Resp. at 6. However, even if the Court were to credit Plaintiff's hearsay statement that Carlos Pichardo told him that he and his team of Hispanic contractors were regularly delayed at the Visitor Center, Dedjoe Dep. at 216, Plaintiff makes no effort to establish that the Hispanic contractors were "similarly situated in all material respects" to the Arsenal's other contractors, Graham, 230 F.3d at 39. Therefore, the alleged delay of Hispanic contractors does not create an inference of racial animus.

Finally, Plaintiff relies on this Court's opinion in Bader v. Special Metals Corporation, which observed that, "evidence of racial . . . harassment . . . beyond what is directed specifically at the plaintiff is relevant" to analysis of a hostile work environment claim. Bader, 985 F. Supp.

17

at 327. In <u>Bader</u>, the plaintiff, a female employee, "detail[ed] a variety of appalling misogynist conduct, including sexually explicit comments directed toward her, "pornography magazines placed in [her] work area," and "regular exposure to misogynist terms." <u>Id.</u> at 326. This Court held that the plaintiff's exposure to "[h]ighly offensive, inherently misogynist terms may reasonably be interpreted to demean *all* women, and therefore may dramatically affect an employee's working conditions even when not 'directed' at her," and also noted that many of the complained-of acts were "explicitly directed" at the plaintiff. <u>Id.</u> at 327 (emphasis in original).

Plaintiff's exposure to racial harassment directed toward others is minimal in comparison to the plaintiff in <u>Bader</u>. Valle's isolated statements to Edwards and Guerra, if they implicate race at all, are certainly not "highly offensive, inherently [racist] terms." <u>See</u> <u>Petrosino v. Bell Atl.</u>, 385 F.3d 210, 222–23 (2d Cir. 2004) (observing that "an African-American plaintiff" being subjected to "his coworkers' daily use of the meanest racial slur against African-Americans" would constitute racial harassment even if the comments were not directed at him). Further, when this Court evaluated Guerra's own hostile work environment claim, it dismissed the incident of the racial slur painted on his door as "'a[n] . . . isolated incident[] of racial enmity.'" <u>Guerra v. Murphy</u>, No. 15-CV-1168, 2016 WL 7480405, at *8 (N.D.N.Y. Dec. 26, 2016) (quoting <u>Schwapp</u>, 118 F.3d at 110). The combined weight of these incidents falls far below the requisite severity and pervasiveness found in <u>Bader</u> to establish a hostile work environment claim. <u>See</u> <u>Schwapp</u>, 118 F.3d at 110 ("[F]or racist comments . . . to constitute a hostile work environment . . . there must be a steady barrage of opprobrious racial comments.") For these reasons, <u>Bader</u> is inapposite and Plaintiff's evidence of harassment directed toward other Arsenal employees does not support his hostile work environment claim.

### b. Incidents Involving Plaintiff

Plaintiff generally alleges that Michael Valle regularly subjected him to racial harassment, and describes five more specific incidents where Arsenal employees (LES employees in particular) allegedly harassed Plaintiff because he is African-American. Compl. ¶¶ 17–26.

#### i. General complaints against Michael Valle

Plaintiff alleges that Valle "would treat Plaintiff like a stranger" when working at the South Gate, and would "hyper-scrutinize" Plaintiff's identification card "in an obnoxious display." Dedjoe Aff. ¶ 37. It is clear, though, that LES personnel working at the South Gate were required to take and physically examine employee identification cards.[3] SMF ¶ 73; Sibiga Ex. D § 6.2. Plaintiff's only evidence that this behavior was motivated by racial animus (other than his theory, described above, that Valle and other LES employees were innate racists) is his statement that Valle "let white employees go with no issues." Dedjoe Dep. at 84. Alleging that Valle did not "hyper-scrutinize" the identification cards of unnamed White employees, without more, does not create an inference of racial animus. See Dudley v. New York Hous. Auth., No. 12-CV-2771, 2014 WL 5003799, at *21 (S.D.N.Y. Sept. 30, 2014) (holding plaintiff's "claims that he was treated differently from unspecified 'non-black co[-]workers' are conclusory and devoid of evidentiary support, and therefore do not raise a genuine issue of material fact"); Walder v. White Plains Bd. of Educ., 738 F. Supp. 2d 483, 500 (S.D.N.Y. 2010) ("Walder relies on conclusory

---

[3] Plaintiff disputes this requirement by stating that it is "discretionary," RSMF ¶ 73, but does not explain the basis for saying so. This claim does not create a genuine factual dispute regarding whether LES personnel were required to physically examine identification cards. Moreover, even if this requirement were actually discretionary, Plaintiff does not provide evidence indicating that Valle exercised his discretion dissimilarly toward Plaintiff and White employees.

allegations that males were given '[f]avorable treatment.' Such conclusory allegations are insufficient [to give rise to an inference of discrimination].").

### ii. The August 24, 2010 E-mail

Plaintiff alleges that his co-worker Brett Herrey targeted Plaintiff because of his race when he sent an e-mail to Plaintiff and five others with the subject line, "WHY STEALING COPPER IS A BAD IDEA," and with an attached slide presentation that contained pictures of an electrocuted Black man. RSMF ¶¶ 100–01. The presentation also contained information regarding "high voltage shock" and the proper tools required to deal safely with high voltage equipment, suggesting that the purpose of the e-mail was to educate the recipients rather than to target Plaintiff. Herrey E-mail; Dedjoe Dep. at 117. Despite Plaintiff's assertion to the contrary, the mere fact that the person in the presentation's pictures was Black and possibly stealing copper, Dedjoe Dep. at 133, is not enough to generate an inference of racial animus. Further, even if Plaintiff correctly reasons that he and the other recipients of the e-mail already knew the information contained in the presentation and did not "need lectures from Brett," this does not mean that Brett possessed the discriminatory motive ascribed to him. Id. at 121. Therefore, the August 24, 2010 e-mail does not support Plaintiff's hostile work environment claim.

### iii. The September 5, 2012 Vandalism Report

Plaintiff alleges that LES officers Roy Barringer and Stephen Huneau dismissed his concern that his car was vandalized because of his race. Dedjoe Aff. ¶¶ 29–34. Plaintiff supports this allegation by asserting that "Arsenal security personnel routinely prepare reports to document vandalism," but that they did not file a report for his complaint until he brought a request from his insurance company. Compl. ¶ 17. It is unclear how this assertion supports Plaintiff, though,

because LES *did* document his complaint the next day. Id. More importantly, though, Plaintiff admits that he is unaware of *any* other vandalism reports made to LES during his employment and *any* resulting investigations. Dedjoe Dep. at 191–92. Without evidence that the LES employees treated Plaintiff less favorably compared to specific, similarly situated White Arsenal employees (e.g., complainants with a similarly damaged car), this incident does not create an inference of racial animus and cannot support his hostile work environment claim.

*iv.  The September 20, 2012 incident*

On September 20, 2012, Plaintiff alleges that Valle radioed Paul Edwards to prevent Plaintiff from entering the Arsenal for driving onto post with an expired date tab sticker. Dedjoe Aff. ¶ 45. Plaintiff alleges that the Arsenal had no "policy banning employees from entering post" if their vehicle had mismatched date tab and registration stickers, Compl.  ¶ 19, and relies on Gallo, 22 F.3d at 1226–27, for the proposition that racial animus is inferred when an employer "violate[s] its own policy" with respect to an employee, Resp. at 5. Even under Plaintiff's description of the incident, however, he was permitted to enter the Arsenal on September 20th. Dedjoe Aff. ¶ 45.  Moreover, it is undisputed that Plaintiff's date tab sticker did not match his state registration's expiration year, RSMF  ¶ 78, and the Arsenal clearly required employees to display a date tab sticker that "correspond[s] to the year that the vehicle's state registration expires,"[4] Sibiga Ex. D. § 5.4.3; Dkt. No. 43-8 ("Command Information Bulletin"). Arsenal

---

[4]  Plaintiff argues that "what constitutes an 'expired date -tab' [sic] is disputed" because "[t]he command information bulletin . . . is ambiguous at best." RSMF  ¶ 7. However, both LES's standard operating procedures during the relevant period, "compliance with [which] is mandatory," and the Command Information Bulletin unambiguously state that "[t]he date tab should correspond to the year that the vehicle's state registration expires." Sibiga Ex. D. § 5.4.3; Command Information Bulletin. Plaintiff argues that the Bulletin's statement that "[a] date tab 2011 or older is expired" renders it unclear whether a date tab 2012 (like Plaintiff's) was expired.

security procedure also permits LES personnel to "deny vehicles with expired post registrations access to the installation." Sibiga Ex. D. § 5.4.3. Further, then-Commander Migaleddi's deposition testimony revealed that the Arsenal "had denied access to several employees" whose vehicles had expired date tab stickers. Migaleddi Dep. at 75. Therefore, Valle's attempt to prevent Plaintiff's entry onto the Arsenal was not contrary to policy, and Plaintiff's reliance on Gallo is unpersuasive.

Plaintiff also does not establish that Valle treated him less favorably than White employees with respect to enforcement of the date tab policy. Although Robert Shadlock, a White employee, had "driven into [the Arsenal] with expired tags all the time," Dedjoe Dep. at 84, Plaintiff was *also* permitted to drive onto the Arsenal on September 20, Dedjoe Aff. ¶ 45, and was never denied entry into the Arsenal for having expired stickers during his employment. The available evidence does not establish dissimilar treatment because neither Plaintiff nor Shadlock were ever turned away from the Arsenal for driving onto post with expired tags, and Plaintiff does not allege that Valle never complained to guards about Shadlock's expired tags.

Similarly, although Plaintiff saw twenty cars in the Arsenal parking lot with expired date tab stickers on September 20, Compl. ¶ 19, because neither Plaintiff nor the owners of those cars were denied entry to the Arsenal, the available evidence permits no inference of dissimilar treatment. Plaintiff makes no effort to indicate that Valle treated any of those people more leniently than he treated Plaintiff. Finally, Plaintiff does not presume to know the races of the

_____

Command Information Bulletin; RSMF ¶ 7. However, the Bulletin was issued on January 24, 2012, and that statement simply means that *all* 2011 date tabs were expired as of the date of the Bulletin's issuance, not that *no* 2012 tabs are expired. Thus, the Court does not treat this purported ambiguity as a genuine factual dispute.

owners of those vehicles. Consequently, it is impossible to tell from this evidence whether Plaintiff was treated "less favorably than a similarly situated employee *outside of the protected group*." Raspardo, 770 F.3d at 126 (emphasis added).

Finally, Defendant's undisputed evidence shows that Valle demanded strict compliance with Arsenal security policies by Arsenal employees regardless of their race. For instance, Plaintiff's White former co-worker, Jim Uram, described Valle as "overly enthusiastic about his work." Uram Dep. at 35. On one occasion, Valle reprimanded Uram for parking his car outside a designated Arsenal parking lot on a Sunday when there was "nobody around" the installation. Id. at 33–35. On another occasion, Uram was forced to replace a flat tire with a spare "studded snow tire" after the period permitted by New York law, and Valle issued him a warning for driving onto post with a snow tire even after Uram explained the situation. Id. at 35–37. Valle's strict enforcement of Arsenal policies against White employees further weakens Plaintiff's claim that Valle's attempt to enforce the date tab policy against Plaintiff was motivated by racial animus.

*v. The November 7, 2012 incident*

Plaintiff alleges that his November 7, 2012 ejection from the Arsenal occurred because of his race. Dedjoe Dep. at 226–27. While Plaintiff's allegations (discussed in more detail in the retaliation section below) indicate that LES's treatment of him was unacceptable, he provides no evidence to support a finding of racial animus other than his assertion that Frasco and Osgood screamed and used profanity that he didn't "believe would be used on white . . . engineers today." Id. at 227. None of this alleged profanity involved racial slurs or otherwise implicated Plaintiff's race, skin color, or national origin. Id. at 227–28. His assertion that the incident nevertheless constitutes racial harassment is wholly conclusory and insufficient to support a hostile work

environment claim. See Bickerstaff v. Vassar Coll., 196 F.3d 435, 451–52 (2d Cir. 1999)

(finding no inference of racial animus where plaintiff's evidence consisted only of "conclusory

allegations"); Gross v. Nat'l Broad. Co., 232 F. Supp. 2d 58, 72 (S.D.N.Y. 2002) ("[C]onclusory

statements and subjective feelings . . . in support of her claims that [plaintiff] was treated

differently because of her gender . . . cannot withstand a properly supported motion for summary

judgment.").

For similar reasons, there is insufficient evidence to brand Valle's treatment of Plaintiff

on November 7, 2012 before his ejection (i.e. sending Plaintiff to the Visitor Center to replace

his car's torn DOD decal and conducting a "long, exaggerated review of [his] application" for a

replacement decal) as racial harassment. Compl. ¶¶ 22–23. The record contains no evidence that

Valle did not send White employees with similarly torn DOD decals to the Visitor Center for a

replacement, nor does the record indicate that Valle conducted more cursory reviews of White

employees' applications.

### vi. The May 2013 Incidents

Plaintiff alleges that the search of his car at the South Gate on May 2, 2013 by LES

employees was motivated by racial animus. Id. ¶ 32. However, it is undisputed that the Arsenal

was conducting a "Random Antiterrorism Measure" that morning, and that twenty-four other cars

were searched pursuant to that program. Sibiga Ex. W. Plaintiff states, however, that another

non-White employee was stopped at the same time as him and "[s]everal cars were sent through

the checkpoint without being searched." RSMF ¶ 57. Regarding the latter, Plaintiff does not

claim to know the races or identities of employees whose cars were not searched (or the races of

twenty-three of the employees whose cars *were* searched) and therefore provides insufficient

evidence to permit the conclusion that LES employees treated Plaintiff less favorably than White employees. Furthermore, Plaintiff does not contest Lieutenant Barringer's explanation that the South Gate guards attempted to search every car that morning, and that cars only passed through without a search when a queue of cars formed at the Gate. Sibiga Ex. W. In the absence of other evidence of racial harassment, the fact that another minority happened to be stopped at the Arsenal at the same time Plaintiff was stopped is inconsequential.

Plaintiff also alleges that the ticket he received from Valle for having an expired inspection sticker on May 5, 2013 was motivated by racial harassment. Compl. ¶ 33. It is undisputed, however, that Plaintiff's inspection expired on March 31, 2013, that he was issued a written and verbal warning earlier that week instructing him that he would receive a ticket if he did not get his car inspected by the end of the week, and that his inspection remained expired when he entered the Arsenal on May 5. RSMF ¶¶ 58–61. No evidence indicates that Valle did not ticket White employees driving onto post with expired inspection stickers. Therefore, neither of the May 2013 incidents generate an inference of racial harassment.

In light of the foregoing, the Court holds that Plaintiff presents insufficient evidence to permit a reasonable jury to conclude that he was subjected to harassment because of his race. Therefore, it is unnecessary to determine whether the alleged harassment was sufficiently severe and pervasive to constitute a hostile work environment or if knowledge of the work environment can be imputed to the Arsenal. The Court grants Defendant's motion for summary judgment with respect to Plaintiff's hostile work environment claim.

### 3. Retaliation

Plaintiff alleges that his ejection from the Arsenal on November 7, 2012 was an act of

retaliation under Title VII. Compl. ¶¶ 41–42; Resp. at 7–8. Title VII states, "It shall be an

unlawful employment practice for an employer to discriminate against any of his employees . . .

because [the employee] has opposed any practice made an unlawful employment practice by"

Title VII. § 2000e-3(a). Establishment of a retaliation claim follows the McDonnell Douglas

burden-shifting framework used in discrimination claims. Zann Kwan v. Andalex Group, LLC,

737 F.3d 834, 844 (2d Cir. 2013) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792

(1973)).

> Under the first step of the McDonnell Douglas framework, the
> plaintiff must establish a prima facie case of retaliation by showing
> 1) 'participation in a protected activity'; 2) the defendant's knowledge
> of the protected activity; 3) 'an adverse employment action'; and 4)
> 'a causal connection between the protected activity and the adverse
> employment action.' The plaintiff's burden of proof as to this first
> step has been characterized as minimal and *de minimis*.

Zann Kwan, 737 F.3d at 844 (quoting Jute v. Hamilton Sundstand Corp., 420 F.3d 166, 173 (2d

Cir. 2006)). Once the plaintiff establishes a prima facie case of retaliation, "'the burden then

must shift to the employer to articulate some legitimate, nondiscriminatory reason' for the

adverse employment action.'" United States v. Brennan, 650 F.3d 65, 93 (2d Cir. 2011) (quoting

McDonnell Douglas, 411 U.S. at 801). The plaintiff must then establish that the defendant's

purported reason was a "pretext" for retaliation. Id.

a.  Protected Activity

"Under 29 U.S.C. § 623(d), an individual has engaged in protected activity if he 'has

opposed any practice made unlawful by this section.'" Grant v. Hazelett Strip-Casting Corp., 880

F.2d 1564, 1569 (2d Cir. 1989) (quoting 29 U.S.C. § 623(d)). The Supreme Court has observed,

"When an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication virtually always constitutes the employee's *opposition* to the activity." <u>Crawford v. Metro. Gov. of Nashville and Davidson Cty., Tenn.</u>, 555 U.S. 271, 276 (2009) (emphasis in original). Thus, the scope of actions qualifying as "protected activity" for the purpose of Title VII retaliation is broad. <u>See</u> <u>Sumner v. U.S. Postal Serv.</u>, 899 F.2d 203, 209 (2d Cir. 1990) (noting that protected activity includes "informal protests of discriminatory employment practices, including making complaints to management, . . . [and] protesting . . . discrimination by . . . society in general"). Because the basis of Plaintiff's retaliation claim is his ejection from the property on November 7, 2012, the protected activity must have taken place *before* that date to be considered the cause of a retaliatory act. The informal complaints Plaintiff alleges he made are clearly protected activity. Plaintiff complained to Frasco about perceived discriminatory treatment of Hispanic contractors in "August or September of 2012." Dedjoe Aff. ¶ 27; RSMF ¶ 110. He accused LES employees of racism when they dismissed his vandalism complaint on September 5, 2012, Dedjoe Aff. ¶¶ 32–34. He claims to have complained of racial harassment after the September 20, 2012 date tab sticker incident to both Osgood and Smith, the Arsenal's then-Chief of Staff. <u>Id.</u> ¶¶ 49, 51. While Defendant disputes whether Plaintiff complained of racial discrimination to Osgood or Smith, <u>see</u> SMF ¶¶ 9, 20–21, Plaintiff's evidence nonetheless creates an issue of fact regarding whether he engaged in protected activity during the relevant time period.

<h4 align="center">b.  <u>Defendant's Knowledge of the Protected Activity</u></h4>

Defendant maintains that, because Frasco had no "knowledge of Plaintiff's informal complaints when he instructed Plaintiff to leave the post," Plaintiff fails to establish the

knowledge prong his prima facie case. Reply at 10. However, "[n]othing 'more is necessary than general [organizational] knowledge that the plaintiff has engaged in a protected activity." Summa v. Hofstra Univ., 708 F.3d 115, 125–26 (2d Cir. 2013) (quoting Gordon v. N.Y.C. Bd. of Educ., 232 F.3d 111, 116 (2d Cir. 2000)). The Second Circuit has held that complaining of discrimination to an officer of a corporate defendant, Zann Kwan, 737 F.3d at 844, or to high-level officials of a defendant organization, Summa, 708 F.3d at 125–26, is enough to impute knowledge to the defendant. As stated above, a jury could find that Plaintiff complained of racial harassment to Smith, who, as the Arsenal's Chief of Staff, was a high-level official at the Arsenal. Thus, knowledge would be imputed to Defendant and it would be irrelevant whether Frasco knew that Plaintiff engaged in protected activity. Moreover, a jury could find that, since Plaintiff's complaint regarding the Pichardo contractors occurred a mere two to three months before his ejection from the Arsenal, Frasco had *personal* knowledge that Plaintiff engaged in protected activity. Therefore, Plaintiff has provided enough evidence to establish the knowledge prong of his prima facie case.

### c. Adverse Employment Action

"Title VII's anti-retaliation provision applies broadly to 'employer actions that would have been materially adverse to a reasonable employee or job applicant.' Actions are 'materially adverse' if they are 'harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" Hicks v. Baines, 593 F.3d 159, 165 (2d Cir. 2010) (quoting Burlington N. & Santa Fe Ry Co. v. White, 548 U.S. 53, 57 (2006)). Plaintiff claims that he suffered an adverse employment action when Frasco—and, later, Osgood—ejected him from the Arsenal. Resp. at 7. Though neither party uses the word, Plaintiff's removal is best

described as a suspension. See, e.g., Sethi v. Narod, 12 F. Supp. 3d 505, 517, 524 (E.D.N.Y. 2014) (describing an incident where plaintiff was "instructed . . . to leave for the day" after allegedly becoming "combative" at meeting as a "suspension with pay"). Plaintiff does not allege that he was forced to forego any wages after being ejected. Therefore, the Court will treat Plaintiff's removal from the Arsenal as a one-day suspension with pay.

The Second Circuit in Brown v. City of Syracuse held "that 'administrative leave with pay . . . does not, without more, constitute an adverse employment action.'" 673 F.3d 141, 150 (2d Cir. 2012) (quoting Joseph v. Leavitt, 465 F.3d 87, 91 (2d Cir. 2006)). "[A]n employee does not suffer a materially adverse change in the terms and conditions of employment where the employer merely enforces its preexisting disciplinary policies in a reasonable manner." Id. However, paid suspensions can constitute an adverse employment action if the suspension goes beyond "appli[cation of] reasonable disciplinary procedures." Id. Courts applying this test have conducted a fact-intensive inquiry to determine whether the defendant "applied its disciplinary procedures unreasonably, thereby exceeding its authority and materially altering the terms and conditions of [the plaintiff's] employment." Id. at 151. See also id. at 150–51 (reviewing a suspended plaintiff's behavior and defendant's policies and concluding no adverse employment action because "[t]here is no contention that [defendant] took an action to suspend [plaintiff] with pay that [defendant's] regulations did not permit"); Chang v. Safe Horizons, 254 Fed. App'x 838, 839 (2d Cir. 2007) (finding no adverse employment action "[b]ecause [defendant] issued [plaintiff] warnings consistent with its progressive discipline policy"); Saber v. New York State Dep't of Fin. Servs., No. 15-CV-5944, 2017 WL 985889, at *11 (S.D.N.Y. Mar. 10, 2017) (no adverse employment action where plaintiff produced insufficient evidence to establish that

defendant "exceeded the pre-existing procedures in connection to the notice of discipline").

Here, there is a genuine issue of material fact regarding whether Frasco and Osgood acted reasonably in suspending Plaintiff. Contrary to the accounts of LES employees who describe Plaintiff as behaving erratically, aggressively, and offensively in the Visitor Center before he was ejected from the property, Sibiga Exs. M, N; Dkt. No. 43-15, Plaintiff states, "I was angry, but I was not 'belligerent.' I was upset, but I was not screaming.'" Dedjoe Aff. ¶ 61. Contradicting Defendant's assertions, Plaintiff also denies using profanity or calling LES personnel "gangsters." Dedjoe Dep. at 222–25. According to Plaintiff, Osgood and Frasco reacted to his relatively innocuous behavior by ejecting him from the property while using profanity, raised voices, and threats of deadly force. Id.; Dedjoe Aff. ¶¶ 63–68. A reasonable jury could credit Plaintiff's version of events and find that Frasco and Osgood "exceeded [their] authority and materially alter[ed] the terms and conditions of [Plaintiff's] employment" by threatening force and expelling Plaintiff from the property when his behavior clearly did not warrant such a response. See Sethi, 12 F. Supp. 3d at 525 (noting that an issue of fact existed regarding whether "[d]efendant[] applied reasonable disciplinary procedures to [p]laintiff" where, inter alia, the parties disputed whether plaintiff behaved aggressively in a manner warranting suspension). Concluding that the officers strayed from reasonable policy with respect to Plaintiff would be especially plausible considering that no deposed former or current Arsenal employee knew of anyone who had been ejected from the Arsenal for something other than alcohol or drug abuse. See SMF ¶ 225; Edwards Dep. at 97–98; Migaleddi Dep. at 148–50; Roe Dep. at 70, 83–84; Smith Dep. at 144–45; Uram Dep. at 22, 24.

Finally, Defendant's observation that Plaintiff's ejection did not, in fact, dissuade him

from initiating EEO contact on the following day, Reply at 9, is legally irrelevant. An action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination," Burlington, 548 U.S. at 68, is "an objective standard," and it does not matter that "*in this particular instance* Plaintiff[] [was] not dissuaded from filing complaints after the allegedly retaliatory acts," Gutierrez v. City of New York, No. 08-CV-6537, 2011 WL 7832709, at *4 (S.D.N.Y. Sept. 26, 2011) (emphasis in original); see also Roncallo v. Sikorsky Aircraft, 447 Fed. App'x 243, 245 (2d Cir. 2011) ("The determination of whether an employment action is 'materially adverse' is an objective one."); Spencer v. Int'l Shoppes, Inc., No. 06-CV-2637, 2010 WL 1270173, at *11 (E.D.N.Y. Mar. 29, 2010) (noting that a requirement that employee be "in fact dissuaded from bringing a charge of discrimination . . . to establish an adverse action . . . would turn an objective test into a subjective test"). For these reasons, a triable issue of fact exists regarding whether Plaintiff's ejection from the Arsenal constituted an adverse employment action.

### d.  Causation

A causal link between a plaintiff's protected activity and an adverse employment action "can be shown either '(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or . . . (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant.'" Littlejohn v. City of New York, 795 F.3d 297, 319 (2d Cir. 2015) (quoting Gordon, 232 F.3d at 117). Moreover, "Title VII is violated when 'a retaliatory motive plays a part in adverse employment actions toward an employee, whether or not it was the sole cause.'" Terry v. Ashcroft, 336 F.3d 128, 140–41 (2d Cir. 2003) (quoting Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2d Cir. 1993)).

Here, the adverse employment action occurred on November 7, 2012, less than two months after Plaintiff's alleged complaint to Smith, and no more than three months after his complaint to Frasco regarding the Hispanic contractors. Courts have held this temporal gap sufficient to establish the causation prong of the prima facie case of retaliation. See Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 110 (2d Cir. 2010) ("[F]or the purposes of a prima facie case . . . we have previously held that five months is not too long to find the causal relationship."); Bader, 985 F. Supp. at 324 ("In general, a temporal gap of less than two months is sufficient to give rise to an inference of causation."); Chan v. New York Univ. Downtown Hosp., No. 03-CV-3003, 2004 WL 213024, at *3 (S.D.N.Y. Feb. 3, 2004) (holding that a two month gap generates an inference of causation).

Moreover, a reasonable jury could consider the statements that Plaintiff attributes to Frasco direct evidence of retaliatory animus. When Plaintiff complained to Frasco about discrimination against Hispanic contractors, Frasco "raised his voice in anger" and asked Plaintiff if he was accusing LES employees of racism. Dedjoe Aff. ¶ 28. On November 7, just two or three months later, when Plaintiff accused the employees at the Visitor Center of racism, Frasco allegedly became angry and shouted, "[A]re you calling us racist *again*?" Id. ¶ 63 (emphasis added). In his sworn statement from November 7, Frasco explains that

> Mr. Dedjoe than [sic] stated (*as he has done on many occasions when things aren't going the way he wants it to*) "You guys are doing this because I am black!" At that time I told Mr. Dedjoe that the conversation is now over and I will not tolerate being accused of racism and explained to him that he will be leaving the post for the day.

Sibiga Ex. N (emphasis added). A reasonable jury could interpret this statement as

expressing frustration with Plaintiff for his previous complaints (to Frasco or to his co-workers), and could conclude that his reaction to Plaintiff's behavior on November 7 would not have been as aggressive if the previous complaints had not been made. For this reason and because of the temporal proximity between Plaintiff's complaints and his ejection from the Arsenal, he has established causation and a prima facie case of retaliation.

### e. Legitimate, Nonretaliatory Reason

As noted above, once a plaintiff articulates a prima facie case of retaliation, the burden shifts the defendant to articulate a legitimate, nonretaliatory reason for subjecting the plaintiff to the adverse employment action. Defendant's burden here is minimal, and "can involve no credibility assessment." Reeves, 530 U.S. at 142. See Baka v. Prime Charter, Ltd., 301 F. Supp. 2d 308, 314 (S.D.N.Y. 2004) ("There is no need to assess the credibility of the proffered reason at this stage nor does [defendant] have to show that it actually relied on these reasons."). Defendant maintains that Frasco and Osgood ejected Plaintiff because he was behaving hostilely and aggressively, Sibiga  Exs. L & N, and because he needed "the opportunity to cool down." Migaleddi Dep. at 151. These are clearly legitimate, non-retaliatory reasons. See Matima v. Celli, 228 F.3d 68, 79 (2d Cir. 2000) (holding "that insubordination and conduct that disrupts the workplace are legitimate reasons for" disciplining an employee).

### f. Pretext

Once the defendant articulates a legitimate, non-retaliatory reason for the adverse employment action, the plaintiff must present evidence sufficient to support a finding that the defendant's purported reason for the adverse employment action was a pretext for retaliation. Zann Kwann, 737 F.3d at 847. This evidence "must establish that [the plaintiff's] protected

activity was a but-for cause of the alleged adverse action by the employer." Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2534 (2013). "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." Zann Kwan, 737 F.3d at 846; see Verga v. Emergency Ambulance Serv., Inc., No. 12-CV-1199, 2014 WL 6473515, at *5 (E.D.N.Y. Nov. 18, 2014); Richardson v. Bronx Lebanon Hosp., No. 11-CV-9095, 2014 WL 4386731, at *16 (S.D.N.Y. Sept. 5, 2014). Moreover, "a plaintiff may rely on evidence comprising her prima facie case, including temporal proximity, together with other evidence such as inconsistent employer explanations, to defeat summary judgment at that stage." Zann Kwan, 737 F.3d at 847; see Raniola v. Bratton, 243 F.3d 610, 625 (2d Cir. 2001) ("Under some circumstances, retaliatory intent may . . . be shown, in conjunction with the plaintiff's prima facie case, by sufficient proof to rebut the employer's proffered reason for the termination.").

Here, much of the evidence described above establishing the causation prong of Plaintiff's prima facie case demonstrates that there exists a triable issue of fact regarding whether Defendant's purported reason for expelling Plaintiff from the Arsenal was pretext for retaliation. First, Plaintiff's ejection from the Arsenal took place not long after his complaints about racism to LES personnel and to Lauren Smith, and temporal proximity can be considered as some evidence of pretext. Zann Kwan, 737 F.3d at 847; Raniola, 243 F.3d at 625. Second, a jury could find that Frasco's statements indicate that Plaintiff's prior accusations of racism contributed to his frustration on November 7 and this frustration—rather than Plaintiff's aggression—caused Frasco to order him off of the Arsenal. Moreover, Frasco's admission that he ejected Plaintiff

because he would "not tolerate being accused of racism," Sibiga Ex. N., could be construed as further evidence of retaliatory intent. Frasco's statement is also potentially inconsistent with Migaleddi's testimony that Plaintiff was expelled from the property to have an "opportunity to cool down." Because of these potential inconsistencies and weaknesses in Defendant's explanation for why Plaintiff was ejected, a question of fact exists regarding whether this explanation was pretextual. Accordingly, Defendant's Motion is denied with respect to Plaintiff's retaliation claim.

## IV.  MOTION FOR SANCTIONS

Plaintiff has moved for monetary sanctions against Defendant, alleging that (1) Defendant and defense counsel unreasonably delayed their response to Plaintiff's Spring 2016 discovery demands; (2) Defendant and defense counsel unreasonably failed to produce the Valle documents in response to Plaintiff's Interrogatory Number 10; (3) Defense counsel conducted an inadequate search for the Valle documents; and (4) in the alternative, Defendant intentionally withheld those parts of the Valle documents that were responsive to the interrogatory. Sanctions Mem. at 3; Sanctions Reply at 5.

### A.  Legal Standard

Plaintiff cites Rules 26(g) and Rule 37(c) of the Federal Rules of Civil Procedure in support of his motion for sanctions. Sanctions Mem. at 1–2. Rule 26(g) requires that attorneys "certif[y] that to the best of the person's knowledge, information, and belief formed after a reasonable inquiry" that all "discovery request[s], response[s], or objection[s]" are "not interposed for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation." Fed. R. Civ. P. 26(g). If a party or their counsel violates Rule

26(g), a court "must impose an appropriate sanction" on the offending party or counsel, which "may include an order to pay the reasonable expenses, including attorney's fees, caused by the violation." Id.

Rule 37(c) authorizes the court to sanction a party that "fails to provide information or identify a witness as required by Rule 26(a) or (e) . . . unless the failure was substantially justified or harmless." Fed. R. Civ. P. 37(c). Rule 26(e), in turn, requires that a party "must supplement or correct" its discovery responses "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect." Fed R. Civ. P. 26(e). Hence, Rule 37(c) authorizes monetary sanctions for a party's failure to, *inter alia*, timely supplement or correct interrogatory responses. For the reasons below, the Court finds that Defendant's conduct during discovery does not warrant sanctions.

**B. Discussion**

*1. Defendant's Delayed Response*

Plaintiff maintains that Defendant should be sanctioned because it responded to Plaintiff's initial discovery demands on August 4, 2016, "a full two months beyond the extended deadline agreed to by the parties." Sanctions Mem. at 3. Defendant argues that its delay does not warrant sanctions because it provided its discovery responses "more than a month in advance of the first defense witness deposition." Sanctions Opp'n Mem. at 3. The Second Circuit disfavors sanctions where the moving party was not prejudiced by the complained-of behavior. In re Lavender, 399 Fed. App'x 649, 653 (2d Cir. 2010) (affirming district court's refusal to impose sanctions, stating "the lack of any meaningful prejudice clearly supported the judge's decision not to impose sanctions"); Design Strategy, Inc. v. Davis, 469 F.3d 284, 296 (2d Cir. 2006)

(noting that "the prejudice suffered by the opposing party" is a factor to consider when deciding whether to impose sanctions); Medina v. E. Commc'n, Inc., No. 16-CV-869, 2016 WL 7377269, at *1 (S.D.N.Y. Dec. 13, 2016) ("Plaintiff has not identified any specific harms resulting from Defendant's delayed responses to its discovery requests, and therefore monetary sanctions are inappropriate."); Cipriani v. Buffardi, No. 06-CV-889, 2008 WL 656742, at *1 (N.D.N.Y. Mar. 6, 2008) ("[I]t does not appear that defendant's delay in responding to the discovery requests, while not condoned, is attributable to bad faith, nor does it appear that plaintiff was materially prejudiced thereby. Plaintiff's request for an award of monetary sanctions is therefore denied."); In re Sept. 11th Liab. Ins. Coverage Cases, 243 F.R.D. 114, 125 (S.D.N.Y. 2007) ("[W]here, as here, much of the evidence at issue was not destroyed but untimely produced . . . the negligent party should sustain liability for breaching its discovery obligations *where such breach causes injury*." (emphasis added)).

Defendants correctly argue that Plaintiff suffered no prejudice from the two month delay. Plaintiff had ample time to incorporate the discovery responses into his preparation for depositions, and does not explain how else Defendant's delay caused harm. Therefore, Defendant's delayed response does not support this motion for sanctions.

### 2. The Valle Documents

Plaintiff also alleges that Defendant should have produced the Valle Documents in response to Interrogatory Number 10, and that sanctions are warranted because the documents were unreasonably withheld until Defendant produced them in response to his September 27, 2016 discovery request. Sanctions Mem. at 3–6. Defendant argues that Interrogatory Number 10 only asked for "document[s] . . . relating to . . . complaints of racial harassment" against LES

employees and Valle in particular, and Defendant did not construe any of the Valle Documents as complaints of racial harassment. Sanctions Opp'n Mem. at 11.

"[T]he Federal Rules of Civil Procedure do not require perfection." Freedman v. Weatherford Int'l, Ltd., No. 12-CV-2121, 2014 WL 4547039, at *3 (S.D.N.Y. Sept. 12, 2014) (quoting Moore v. Publicis Groupe, 287 F.R.D. 182, 192 (S.D.N.Y. 2012)). More specifically, "[t]he standard for evaluating discovery is reasonableness, not perfection." Agerbrink v. Model Serv., LLC, No. 14-CV-7841, 2017 WL 933095, at *5 (S.D.N.Y. Mar. 8, 2017).

Plaintiff cites several items in the Valle Documents describing complaints by several Arsenal employees that he claims constitute documents relating to racial harassment. Sanctions SMF ¶¶ 34–36, 39, 41, 43, 47. These documents, however, range from obviously non-responsive to Interrogatory No. 10 to merely conceivably responsive. First, the document containing Danielle Attanasio's complaint describes sexual harassment, but makes no mention of racial harassment. Sanctions SMF ¶¶ 40–41. Second, even if Samuel Hinton told Plaintiff's counsel on December 8, 2016 that he perceived his complaints against Valle as involving racial harassment, id. ¶ 45, and even if his affidavit, dated May 12, 2017, complains of racial profiling, Hinton Aff. ¶ 19, no document referencing his complaint in the Valle documents make such an allegation, Hinton Exs. Third, the allegedly responsive e-mail involving Guerra only discusses his allegation that Valle mispronounced his name, and does not mention racial harassment. Id. ¶ 43. Fourth, the documents relating to Edwards' 2011 complaint mention Valle's statement that Edwards "should learn to speak English" alongside a litany of allegations that, as stated in the hostile work environment discussion above, cannot plausibly be construed as racial harassment. Id. ¶¶ 37–39.

Plaintiff also cites Smith's memo outlining the rationale for Edwards' 2011 suspension as

responsive to Interrogatory No. 10. Sanctions SMF ¶ 36. Smith's memo briefly expresses concern that Valle's "learn to speak English" statement "appears to target [Edwards'] ethnicity." Sanctions Opp'n Mem. at 15. However, a lone statement acknowledging that one statement in a complaint may have been racially motivated transforms neither Smith's memo nor Edwards' complaint into documents that clearly relate to racial harassment.

Defendant's requirement to behave *reasonably* when responding to Interrogatory Number 10 plainly did not require it to interpret any of the above documents as relating to complaints of racial harassment. With the exception of the statement in Smith's memorandum, none of the complaints even mention ethnicity or race. Even assuming that Plaintiff's interpretation of these documents is conceivable, Defendant is not required to respond only after divining every document that Plaintiff would deem responsive to its discovery demands. Because its response was reasonable, Plaintiff's remaining arguments in support of his motion are inconsequential, and the Court denies Plaintiff's Motion for Sanctions.

## V.    CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendant's Motion for Summary Judgment (Dkt. No. 43) is **GRANTED** with respect to Plaintiff's discrimination and hostile work environment claims and **DENIED** with respect to Plaintiff's retaliation claim; and it is further

**ORDERED**, that Plaintiff's Motion for Sanctions (Dkt. No. 34) is **DENIED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**


DATED:     September 28, 2017
           Albany, New York


Lawrence E. Kahn
U.S. District Judge